# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|                              |     |            |
|------------------------------|-----|------------|
| UNITED STATES OF AMERICA,    | )   |            |
|                              | )   |            |
|                              | )   |            |
| v.                           | )   |            |
|                              | )   | 2:17-cr-284 |
| ALEXANDER COLE and           | )   |            |
| SEMAJ CARTER,                | )   |            |
|                              | )   |            |
| Defendants.                  | )   |            |
|                              | )   |            |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

In June 2017, members of the Monroeville (PA) Police Department began an investigation into possible drug activity at the Northern Pike Apartments in that community. The investigation led to a traffic stop. The traffic stop led to a pat down. The pat down uncovered several bricks of heroin. The heroin discovery led police to obtain a search warrant for a residence at the Northern Pike Apartments. And the execution of that warrant led to the seizure of fentanyl, firearms, and cash. This series of events culminated in the arrest of Defendants Semaj Carter ("Carter") and Alexander Cole ("Cole") by the Monroeville Police. The case was adopted for federal prosecution and the Defendants were indicted in federal court.

Carter and Cole now move to suppress all of the evidence obtained during the traffic stop of their vehicle, all statements made during the traffic stop, and all evidence recovered during the subsequent execution of a search warrant at their apartment. The Court held a suppression hearing and the parties fully briefed the issues. For the reasons that will follow, Carter and Cole's Motion to Suppress is DENIED.

## I. BACKGROUND

On October 17, 2017, a federal grand jury returned a four-count indictment against Carter and Cole. (Indictment, ECF No. 1.) The first three (3) counts of the indictment charged Cole with possession with the intent to distribute forty (40) grams or more of fentanyl in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi); possession with intent to distribute a quantity of fentanyl in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); and unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) The final count of the indictment charged Carter with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.)

Cole filed a Motion to Suppress Evidence (Mot. to Suppress, ECF No. 71), which Carter joined in full.[1] (Mot. to Join, ECF No. 51.) Both Defendants seek to suppress all evidence and statements obtained during a traffic stop of their vehicle on June 30, 2017, as well as contraband found when police executed a search warrant at the Northern Pike Apartments that same day. (ECF No. 71; Carter Post-Hr'g Br., ECF No. 115, at 1, 6.) Counsel for both Defendants and the Government fully briefed the issues. (ECF Nos. 71, 73.) The Court held evidentiary hearings on January 28, 2019, March 21, 2019, and April 8, 2019. (Trs. Available at ECF Nos. 91, 107, and 110.) Upon request from counsel for both Carter and Cole, the Court granted multiple extensions of time for defense counsel to obtain a hearing transcript and submit supplemental briefing. (ECF No. 100.) All parties submitted post-hearing briefs. (ECF Nos. 115, 118, 128, 132.) With post-hearing briefing now complete, the Court can decide Carter and Cole's Motion.

---

[1] Cole originally filed his Motion to Suppress at ECF No. 38. Cole's counsel who had authored that Motion to Suppress, however, withdrew his appearance on behalf of Cole. (Order, ECF No. 55.) Thereafter, Cole's new counsel re-filed the Motion to Suppress at ECF No. 71. Therefore, ECF No. 38 will be dismissed without prejudice as moot in light of Cole's filing of ECF No. 71.

## II. **FACTUAL FINDINGS**

The trial judge takes on the role of fact finder when deciding a motion to suppress. *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012). Therefore, the trial judge is responsible for assessing the credibility of the testifying witnesses, weighing the evidence, and reaching any "inferences, deductions and conclusions to be drawn from the evidence." *Id.*

Over the course of three (3) separate days, the Court heard testimony from four (4) witnesses. The United States called Monroeville Patrol Officer Jeremy Frisk ("Officer Frisk"), Monroeville Detective Sergeant William Krut ("Sergeant Krut"), and Monroeville Detective Steven Maritz ("Detective Maritz") to testify. Defendant Cole testified on his own behalf. The Court found all of the testifying witnesses to be credible, and makes the following factual findings based upon the testimony given and the exhibits admitted at the suppression hearing.

### A.    **Officer Frisk's Testimony**

On June 12, 2017, Officer Frisk[2] responded to a 9-1-1 call from Michael (or Mike) Malik—the landlord at the Northern Pike Apartments on Monroeville Road. Officer Frisk knew Mr. Malik from repeated calls involving the Northern Pike Apartments. (Tr. of Proceedings of Jan. 28, 2019, ECF No. 91, at 18:11–15.) Officer Frisk testified that he frequently responded to calls related to landlord-tenant issues at the Northern Pike Apartments. (*Id.* at 18:16–23.) The reason for Mr. Malik's call on June 12 was that one (1) of the complex's "apartment[s] had two individuals living in it that had not paid rent, and of the two individuals, neither one of them were on the lease agreement." (*Id.* at 19:17–20.)

---

[2] Officer Frisk is a patrol officer for the Monroeville Police Department. (Tr. of Proceedings of Jan. 28, 2019, ECF No. 91, at 14:1–3.) Prior to joining the Monroeville Police Department in 2014, Officer Frisk worked as a law enforcement officer for various other townships and boroughs in Western Pennsylvania—serving as a narcotics canine handler for seven (7) years and as a team member on a regionalized drug task force in Allegheny County, Pennsylvania. (*Id.* at 14:8–16:13.)

According to Officer Frisk, the Northern Pike Apartments consist of several separate buildings each marked by an alphabetical letter. Each building contains multiple apartment units. (*Id.* at 19:24–20:10, 49:3.) Building E, which included the apartment that Mr. Malik called about, has one (1) common door to enter the building. Inside Building E, each individual apartment is accessible by its own door. (*Id.* at 34:18–20.) The Monroeville Police Department receives frequent calls to the Northern Pike Apartments for disturbances, narcotics, and overdoses, and Officer Frisk considers it a "high crime area." (*Id.* at 27:17–28:17.)

When Officer Frisk arrived at the Northern Pike Apartments, he met with Mr. Malik, who identified the apartment unit at issue ("the Apartment") as one located in Building E.[3] (*Id.* at 19:21–23.) Mr. Malik conveyed his frustrations to Officer Frisk, identifying an individual who was not on the Apartment's lease and who was not to be on the property. (*Id.* at 38:23–39:2.) As he listened to Mr. Malik, Officer Frisk saw a black male wearing a red flat-brimmed hat standing in front of Building E. (*Id.* at 20:21–24.) The man in the red hat then approached Officer Frisk and Mr. Malik. With Officer Frisk present, Mr. Malik and the man talked about "payment for rent and also the issue of the individual not being on the lease agreement" for the Apartment (*Id.* at 21:4–22:2.) The man in the red hat, Officer Frisk gathered, lived in the Apartment. Eventually, the man offered to pay the allegedly owed rent and handed Mr. Malik a sum of cash. (*Id.* at 22:3–16.) Officer Frisk identified the man who paid the rent as Alexander Cole—though he could not remember exactly how he figured out Cole's identity on that day. (*Id.* at 22:25–23:5.)

---

[3] To further the objectives of W.D. Pa. Civ. R. 5.2(D)(5)—Redaction of Personal Identifiers, Home Addresses—which applies to documents on the Court's criminal docket, the Court will refrain from referencing the specific unit number for the Apartment that drew the attention of law enforcement in this case.

After paying Mr. Malik, Cole walked back to the front of Building E.[4] Officer Frisk returned to his conversation with Mr. Malik, who told Officer Frisk of his concerns that he had observed activities consistent with narcotics use and trafficking. (*Id.* at 24:2–17.) Mr. Malik stated that several individuals who did not live at the Northern Pike Apartments would come and go "in a fashion that was very quick, not staying long and then leaving" from Building E, "and precisely [the Apartment]." (*Id.* at 24:20–25:3.) Mr. Malik told Officer Frisk that he suspected two (2) individuals of engaging in drug activity—Defendant Cole and unidentified man. (*Id.* at 25:13–20.) Mr. Malik also identified a new model, dark-colored Dodge Charger with New Jersey plates as a vehicle associated with the Apartment. (*Id.* at 29:1–8.)

Officer Frisk told Mr. Malik to call the police if he witnessed any additional activity that he suspected to be drug related. (*Id.* at 26:3–6.) Following the June 12 dispatch, Mr. Malik contacted Officer Frisk directly on four (4) or five (5) occasions, passing along information about cars and individuals entering Building E and "general activity that [Mr. Malik] believed to be narcotics related." (*Id.* at 26:17–21.) Mr. Malik told Officer Frisk that his concerns were related to Building E and sent Officer Frisk a text message with a photo of the vehicle he mentioned on June 12. (*Id.* at 26:23–27:8, 50:25–51:3.) Officer Frisk considered Mr. Malik's information reliable. (*Id.* at 27:13–16.) Although Mr. Malik installed cameras at the Northern Pike Apartments, Mr. Malik never shared any photos or videos of the complained-of activity with Officer Frisk. (*Id.* at 51:4–7.)

Based on Mr. Malik's information, Officer Frisk conducted surveillance at the Northern Pike Apartments five (5) to ten (10) times between June 12 and June 29, 2017. (*Id.* at 29:14–18, 33:3–7.) During this surveillance, Officer Frisk observed vehicles coming and going, with

---

[4] Officer Frisk did not arrest Cole for trespassing or further act upon Mr. Malik's comment that Cole was not allowed on the property because, in Officer Frisk's understanding, it was not against the law for Cole to be present in an apartment even though his name was not on the lease. (*Id.* at 39:1–12.)

individuals entering Building E for only a short period of time. (*Id.* at 29:14–30:10.) Based on his training, Officer Frisk found this behavior to be consistent with narcotics trafficking. (*Id.* at 30:15–17.) Officer Frisk, however, could not see any particular unit inside Building E during his surveillance. (*Id.* at 30:21–25.) Several times during his surveillance, Officer Frisk observed the dark-colored Dodge Charger come and go from the Northern Pike Apartments parking lot, often parking in front of Building E. (*Id.* at 31:1–9.) Officer Frisk saw individuals come and go from Building E but was unable to identify the individuals beyond noting that they were black males. (*Id.* at 31:13–32:8.) Officer Frisk never stopped anyone that he saw come or go from Building E during his surveillance. (*Id.* at 53:24–54:3.)

Throughout his surveillance, Officer Frisk did not write any reports about what he observed. Believing that the situation warranted further "looking into" by detectives, Officer Frisk passed along the information he gathered to Detective Maritz. (*Id.* at 32:12–24, 52:8–12.)

### B. Sergeant Krut's Testimony

At approximately 11:00 AM on June 30, 2017, Sergeant Krut[5] and Detective Maritz, wearing plainclothes and riding in separate unmarked vehicles, conducted surveillance at the Northern Pike Apartments. (ECF No. 91, at 62:20–63:8.) Sergeant Krut considered the Northern Pike Apartments to have a "little higher concentration of drug dealing activity" than most other apartment complexes. (*Id.* at 63:16–65:12.) During his time with the Monroeville Police Department, Sergeant Krut participated in several drug investigations at the Northern Pike Apartments. He suspected a different person who might be living in the same building—possibly even next door to Cole—as being involved in drug trafficking. (*Id.* at 63:16–65:12, 144:21–

---

[5] Sergeant Krut has been a police officer for twenty-eight (28) years following his time as a United States Army counterintelligence agent. (ECF No. 91, at 61:1–62:2.) He has been employed with the Monroeville Police Department for over twenty-five (25) years and supervises its Criminal Investigations Division. (*Id.* at 61:4–19.)

145:14.) At one point prior to June 30, Sergeant Krut accompanied Officer Frisk to meet with Mr. Malik in Mr. Malik's office at the Northern Pike Apartments. (*Id.* at 111:3–8, 144:4–12.)

On June 30, Sergeant Krut and Detective Maritz focused their attention on the Northern Pike Apartments based on Officer Frisk's belief that there were individuals driving a dark-colored Dodge Charger who might be involved in drug trafficking. (*Id.* at 65:23–66:4.) Officer Frisk told Sergeant Krut the information provided by Mr. Malik, as well as his own observations that backed up Mr. Malik's complaints. Specifically, Officer Frisk told Sergeant Krut about a man named Alexander Cole, the black Dodge Charger with New Jersey registration, and the Apartment. (*Id.* at 66:1–67:2, 108:19–25.) Although Monroeville police officers are allowed to follow up on tips and do some surveillance, Officer Frisk did not provide Sergeant Krut with any formal written report. (*Id.* at 118:16–25.)

In the late morning on June 30, Sergeant Krut and Detective Maritz began following the Dodge Charger until it stopped at a Buffalo Wild Wings parking lot, where one (1) person got out of the car and went into the restaurant.[6] (*Id.* at 67:8–16.) Meanwhile, one (1) of the Dodge Charger's windows was "cracked a little bit, and there was a lot of smoke emanating from the vehicle." (*Id.* at 69:4–13.) Sergeant Krut suspected that this was marijuana smoke.[7] (*Id.*) Sergeant Krut attempted to drive closer to the Dodge Charger to try to smell an odor of marijuana but was

---

[6] Sergeant Krut could not remember where he was positioned when he began following the Dodge Charger. (*Id.* at 68:6–8.) He also did not recall witnessing individuals get into the car prior to the car departing its initial location. (*Id.* at 68:5.)

[7] Sergeant Krut testified that his opinion that the smoke emanating from the Dodge Charger was marijuana smoke resulted from his prior observations of people smoking marijuana. In his experience, marijuana typically results in "heavy" smoke, as if someone inhales a large amount, holds it in and then blows it out. Sergeant Krut also observed that the smoke did not appear to be a vapor (as from electronic cigarettes) and that it produced a larger volume of smoke than someone simply smoking a cigarette. (*Id.* at 70:12–22.) Sergeant Krut did not effectuate any sort of arrest for what he suspected was marijuana use because absent the odor of marijuana, he did not feel that he had probable cause nor could he "testify" as to what the smoke actually was. (*Id.* at 107:8–16, 142:11–21.)

unsuccessful. (*Id.* at 71:4–5.) The Dodge Charger then departed the parking lot and Sergeant Krut and Detective Maritz lost sight of the vehicle. (*Id.* at 71:17–24.)

Later that day, at approximately 12:45 PM, Detective Maritz notified Sergeant Krut that he found the Dodge Charger, which was now leaving the Northern Pike Apartments and headed in the direction of Sergeant Krut's parked location—which Sergeant Krut identified as either the BP Gas Station or the Eat 'N Park (both of which are at the intersection of Monroeville Boulevard and Stroscheim Road). (*Id.* at 146:18–22; Gov't's Ex. 1.) Sergeant Krut spotted the Dodge Charger and began following it through several intersections. (ECF No. 91, at 72:21–75:22.) He intended to stop the Dodge Charger if it committed a motor vehicle violation. (*Id.* at 147:23–24.) Although Sergeant Krut's vehicle was close behind the Dodge Charger, he was unable to recall whether there were any cars between his unmarked vehicle and the Dodge Charger. (*Id.* at 75:22–76:5.) Sergeant Krut observed the Dodge Charger stop at a red light, make several turns, and advance through several intersections without committing any traffic violations. (*Id.* at 76:25–82:1.)

Eventually, the Dodge Charger came to a stop at a red light at the intersection of William Penn Highway and Old Haymaker Road. (*Id.* at 76:25–77:11.) The vehicle then made a left-hand turn at that intersection without incident and drove north on Old Haymaker Road. (*Id.*) But after that turn, as the Dodge Charger continued to travel north, Sergeant Krut observed the vehicle fail to signal a lane change as it merged right into an exit lane that leads to Interstate 376 via a "hairpin turn." (*Id.* at 78:2–82:1.) Sergeant Krut remembered having a line of sight to the back of the Dodge Charger but could not recall whether he could see both taillights at the same time since he was focusing on the right side to check for signaling. (*Id.* at 83:1–10.) At this point, Sergeant Krut was two (2) or three (3) car lengths behind the Dodge Charger. (*Id.* at 151:8–11.)

After observing the failure to signal, Sergeant Krut activated his emergency lights, and the vehicles came to a stop at the conclusion of the hairpin turn onto Interstate 376. (*Id.* at 81:17–82:11; Gov't Ex. 2.) Sergeant Krut parked his car behind the Dodge Charger and called into dispatch to report that he was making a traffic stop. (ECF No. 91, at 82:3–5, 83:20–84:8.)

Sergeant Krut then approached the Dodge Charger as Detective Maritz exited his own vehicle and ran up to meet Sergeant Krut. (*Id.* at 84:12–16.) Sergeant Krut approached the Dodge Charger on the passenger side and Detective Maritz approached the driver side. (*Id.* at 84:12–16, 85:13–16.) Cole rolled the passenger window down, enabling Sergeant Krut to observe two (2) people inside the Dodge Charger. (*Id.* at 85:2–5, 87:2–3.) Cole identified himself, provided his birthdate, and shared that he was on federal probation. (*Id.* at 85:23–86:4.) Sergeant Krut identified Semaj Carter as the driver. (*Id.* at 86:24–87:1.) While speaking with Carter and Cole, Sergeant Krut smelled an odor—which he described as a mixture of fresh and burned marijuana—inside the vehicle. (*Id.* at 86:5–23.) Sergeant Krut returned to his vehicle and ran Carter and Cole's names to check whether either man possessed a valid driver's license or any outstanding warrants. (*Id.* at 87:12–15.) Police dispatch informed Sergeant Krut that neither Cole nor Carter had a valid driver's license. (*Id.* at 88:5–20.)

Sergeant Krut then returned to the passenger side of the Dodge Charger where Detective Maritz indicated from the driver's side that he observed an unnatural bulge in Cole's trousers—although Sergeant Krut did not personally observe the alleged bulge. (*Id.* at 87:12–19, 128:14–21.) Sergeant Krut and Detective Maritz then instructed Cole and Carter to exit the vehicle. (*Id.* at 92:20–21.) Sergeant Krut made the decision to pat down Cole, which he based on the following information: (1) the report he received from Officer Frisk; (2) the fact that drug dealers often carry firearms for protection; (3) the violence that Sergeant Krut knew of at the Northern

Pike Apartments; and (4) the fact that Cole said he was on federal probation. (*Id.* at 92:22–12.) Sergeant Krut also testified that he wanted to "make sure that the bulge that Detective Maritz saw wasn't a gun." (*Id.* at 134:20–23.)

Sergeant Krut then performed a pat down. When he went up the inside of Cole's leg with his hand, he felt something around Cole's groin area that was "angular and did not feel like a natural anatomy." (*Id.* at 94:5–14.) He described the location of the non-anatomical object as "below the other part of his anatomy"—referring to Cole's testicles—between Cole's legs or "in the front area." (*Id.* at 133:15–23, 134:7–14.) When asked whether the item was in front of or behind Cole's testicles, Sergeant Krut was unable to answer as he "didn't continue up to identify where [Cole's] testicles were." (*Id.* at 134:11–14.) Regardless, Sergeant Krut "could tell that it was not a firearm because it had some give to it, but it felt like something sort of squarish in shape and not soft—like a testicle." (*Id.* at 94:15–17.) When he felt the angular item, Sergeant Krut instantly made the determination that Cole had bricks of heroin in his groin area. (*Id.* at 95:14–15.) Sergeant Krut based his determination on two (2) things. The first was the location of the item. In Sergeant Krut's experience, heroin dealers are known to hide their heroin "below-the-waist," so to speak. (*Id.* at 94:20–95:1.) The second reason for Sergeant Krut's determination was the feel of the item. Experience taught Sergeant Krut that bricks of heroin are often tightly packed with rubber bands, forming an angular shape that is softer than a piece of wood but firmer than a small bag with marijuana in it. (*Id.* at 95:2–13.)

After making the determination that he identified bricks of heroin during his pat down of Cole, Sergeant Krut told Detective Maritz about his suspected find. (*Id.* at 95:17–19.) Detective Maritz then asked Cole about the item Sergeant Krut identified, and Cole indicated that he did have heroin in his boxer briefs. (*Id.* at 95:17–23.) Sergeant Krut or Detective Maritz then

obtained the item from Cole's groin area, which was a bag containing bricks of heroin. (*Id.* at 96:15–97:1.) The item recovered from Cole's pants, Sergeant Krut testified, "was about the size of a softball." (*Id.* at 99:15–17; Gov't's Ex. 3) Following the pat-down, either Sergeant Krut or Detective Maritz performed a search of Cole's person, which retrieved $800 in United States currency. (ECF No. 91, at 97:16–98:3.)

Cole and Carter were placed in the back of a marked police car—which arrived as back-up. Cole volunteered consent to Sergeant Krut to search the Dodge Charger, although Sergeant Krut cannot remember at which point in the stop this was given. (*Id.* at 127:16–24.) Sergeant Krut and Detective Maritz then searched the Dodge Charger, ultimately finding a single marijuana bud in the rear seat armrest cup holder. (*Id.* at 101:3–20.) Carter and Cole were arrested and the Dodge Charger—a rental with neither Cole nor Carter listed on the rental agreement—was towed to the local police station. (*Id.* at 101:23–103:15.) Because Cole and Carter informed Sergeant Krut that they were coming from the Northern Pike Apartments, Detective Maritz then prepared a search warrant for the Apartment located at that complex. (*Id.* at 130:15–20.)

### C.    **Detective Maritz's Testimony**

On June 30, 2017, Detective Maritz[8] and Sergeant Krut conducted surveillance at the Northern Pike Apartments. (Tr. of Proceedings of March 21, 2019, ECF No. 107, at 11:8–14.) Detective Maritz considers the Northern Pike Apartments to be a "high-crime drug area where officers of the Monroeville Police Department and other agencies, local, county, and federal have made numerous arrests for drug trafficking." (*Id.* at 13:9–13.)

---

[8] Detective Maritz has worked for the Monroeville Police Department for six (6) years, and he has eleven (11) years of experience as a law enforcement officer. (Tr. of Proceedings of March 21, 2019, ECF No. 107, at 10:7–20.)

The day before Detective Maritz and Sergeant Krut conducted surveillance, Detective Maritz received information from Officer Frisk regarding the tenants of the Apartment and their vehicle—a black Dodge Charger with New Jersey registration. (*Id.* at 12:2–13.) Officer Frisk reported to Detective Maritz that he conducted surveillance on the Northern Pike Apartments, following up on information from Mr. Malik and his interaction with Cole on June 12 when Cole paid Mr. Malik for the rent. (*Id.* at 12:2–23.) Specifically, Officer Frisk relayed to Detective Maritz that he observed foot traffic from Building E. (*Id.* at 62:20–16.) Detective Maritz also knew that there was a known drug trafficker living in Building E. (*Id.* at 66:4–6.)

On June 30, Detective Maritz observed the Dodge Charger parked in front of Building E at the Northern Pike Apartments. (*Id.* at 13:21–23.) Detective Maritz then saw three (3) black males—one of whom was wearing "some type of red clothing"—exit Building E and get into the Dodge Charger. Detective Maritz did not recognize any of the men. (*Id.* at 14:10–23.) The Dodge Charger drove to Buffalo Wild Wings, where Detective Maritz observed smoke coming from the vehicle. (*Id.* at 15:2–8.) The backseat passenger exited the vehicle and entered Buffalo Wild Wings, at which point the Dodge Charger departed the parking lot. (*Id.* at 15:9–12.) Shortly thereafter, Detective Maritz lost sight of the vehicle as it headed out of Monroeville. (*Id.* at 15:13–20.)

Around 12:44 PM the same day, Detective Maritz observed the Dodge Charger—this time with only two (2) black males in the vehicle—exiting the Northern Pike Apartments parking lot. (*Id.* at 15:21–16:9.) He observed the Dodge Charger turn into the BP Gas Station, which is about 150 to 200 yards away from the Northern Pike Apartments. (*Id.* at 16:6–12.) At this point, Detective Maritz was unaware of Sergeant Krut's exact location, but knew from their cell phone communication that Sergeant Krut was North of him. (*Id.* at 16:20–25.) After "no more than five

minutes," the Dodge Charger exited the BP Gas Station heading North, at which point Detective Maritz again lost sight of the vehicle. (*Id.* at 17:1–6.) Sergeant Krut, who reported to Detective Maritz over cell phone that he "had eyes on the vehicle," told Detective Maritz that the Dodge Charger failed to use a turn signal while merging from Old Haymaker Road onto the on-ramp leading to Interstate 376. (*Id.* at 17:7–22.) Detective Maritz recalled being about a "couple hundred yards away" and did not personally observe the traffic violation. (*Id.* at 17:23–18:3.)

Detective Maritz proceeded to Sergeant Krut's location, where Sergeant Krut was initiating a traffic stop. Detective Maritz parked his vehicle 150 to 175 yards from the Dodge Charger. (*Id.* at 18:6–17.) As Detective Maritz approached the Dodge Charger, Sergeant Krut was already at the passenger side window of the vehicle speaking with the occupants. (*Id.* at 19:23–25.) Sergeant Krut walked away from the Dodge Charger and advised Detective Maritz that he smelled marijuana coming from the vehicle and that he talked to both the driver and the passenger, obtained their names and dates of birth, as well as either their licenses or identification cards—though he could not recall which. (*Id.* at 20:1–6.) Sergeant Krut relayed that both men were coming from the Northern Pike Apartments, and Cole advised Sergeant Krut that he was on federal probation. (*Id.* at 19:23–25.)

While Sergeant Krut ran the information through dispatch, Detective Maritz went to the passenger side and spoke to the two (2) men in the Dodge Charger. (*Id.* at 20:11–13.) Detective Maritz also smelled the odor of marijuana coming from the Dodge Charger, and while speaking with Cole, Detective Maritz noticed a "large unnatural bulge in [Cole's] crotch area," that was "directly below [Cole's] belt line right in the middle of the crotch area." (*Id.* at 20:14–16, 42:15–22.) Due to the size of the "roundish" bulge, "it was elevated above his lap." (*Id.* at 42:24–25, 43:17.) Carter, sitting on the driver's side, appeared "extremely nervous, . . . . breathing pretty

rapidly" with his "chest rising and falling at a rapid rate." (*Id.* at 20:23–21:3.) When Detective Maritz asked both men whether there was anything illegal in the car, Cole responded: "I know how this works. You can search if you want." (*Id.* at 21:9–11.) Detective Maritz asked Carter for permission to search the vehicle and Carter similarly consented. (*Id.* at 21:12–13.)

Next, the officers asked Cole and Carter to exit the vehicle and patted them down. (*Id.* at 21:15–16.) Detective Maritz testified that the pat down was for officer safety, based on the tips he received from Officer Frisk of possible drug trafficking coming from the Northern Pike Apartments, and Detective Maritz's training and experience that drug traffickers often carry firearms to protect themselves and their product. (*Id.* at 21:15–22.) In addition, Carter's nervousness, the "large unnatural bulge in Mr. Cole's pants," and Cole's status on federal probation gave Detective Maritz further concern for officer safety. (*Id.* at 21:23–22:1.)

Detective Maritz patted down Carter while Detective Krut patted down Cole. (*Id.* at 22:2–7.) Although Detective Maritz had a view of Sergeant Krut's pat down of Cole, Detective Maritz's focus was trained on Carter. (*Id.* at 22:21–25.) Detective Maritz did not recover any contraband from his pat down of Carter. (*Id.* 25:17–22.) Sergeant Krut, on the other hand, advised Detective Maritz that he felt what he believed to be bricks of heroin in Cole's pants. (*Id.* at 23:2–3.) Prompted by Sergeant Krut's discovery, Detective Maritz asked Cole what he had in his pants and Cole admitted that he had heroin in his boxer briefs. (*Id.* at 23:2–8.) Cole was then given an opportunity to remove the item himself. (*Id.* at 23:16–20.) Electing not to have the officers reach down his pants, Cole removed a knotted plastic baggy "slightly smaller than a softball" containing ten (10) bricks of heroin or fentanyl from its secreted location. (*Id.* at 23:23–24:20; Gov't's Ex. 3.)

The officers arrested Cole and searched him incident to his arrest. That search recovered United States currency. (ECF No. 107, at 25:4–10.) Both Detective Maritz and Sergeant Krut then searched the Dodge Charger based on what they believed was probable cause from the smell of marijuana coming from inside the vehicle and the consent from both men. (*Id.* at 25:23–26:12.) Sergeant Krut recovered a small amount of a substance consistent with the appearance of marijuana from the back-seat armrest cupholder. (*Id.* at 27:13–28:3.) Detective Maritz and Sergeant Krut had Cole and Carter transported to the Monroeville Police Department, while Maritz and Krut waited for a tow truck to collect the Dodge Charger. (*Id.* 29:5–9.)

While he and Sergeant Krut waited for the tow truck, Detective Maritz began to prepare an affidavit of probable cause for a warrant to search the Apartment at the Northern Pike Apartments. (*Id.* at 29:5–13, 30:4–6.) Sergeant Krut and Detective Maritz eventually returned to the police station, where—according to Detective Maritz's affidavit—they spoke with Leah Evans, who is Carter's mother. (*Id.* at 54:20–23; Gov't Ex. 5.) Ms. Evans stated that Cole lived at the Northern Pike Apartments, and that Carter "stays" there. (Gov't Ex. 5.) Sergeant Krut then went to the Northern Pike Apartments where Mr. Malik "identified . . . Cole and Carter" as the residents of the Apartment—information which Detective Maritz included in his affidavit. (*Id.*) And Detective Maritz's affidavit specifically referenced Carter's failure to signal as the basis for stopping Cole and Carter's Dodge Charger, as well as the suspected heroin found during Sergeant Krut's pat down of Cole. (*Id.*)

The local state magistrate judge issued a search warrant the same day, which included search categories of heroin and anything used in the distribution or processing of heroin. (ECF No. 107, 30:11–16.) During the warrant's execution, Monroeville police seized twenty-two (22) items from the Apartment, including heroin, fentanyl, a Browning Arms Hi Power .40 caliber

pistol, a Smith & Wesson Model SD9VE 9mm caliber pistol, and ammunition for both handguns (*Id.* at 30:25–31:14; Gov't's Ex. 5.)

### D.    Alexander Cole's Testimony

Cole heard the testimony of the three (3) Monroeville police officers and, under oath, admitted to being present in the vehicle during the traffic stop. (Tr. of Proceedings of April 8, 2019, ECF No. 110, at 10:12–11:3.) When asked at what point he noticed the police lights flashing behind him, Cole responded that he and Carter were "off the ramp. [And] had already came around the ramp. [And] were going straight" on the parkway. (*Id.* at 12:15–24.) Later, Cole described the location as "right at the end of the curve," referring to the loop onto the main interstate. (*Id.* at 36:9–22.) At the time Cole noticed the police lights, he saw one (1) vehicle between the Dodge Charger and the police vehicle. (*Id.* at 12:23–25.)

Once Carter and Cole realized they were being pulled over, Carter told Cole: "I used my turn signal I don't know what's going on." (*Id.* at 11:19–25, 13:1–7.) Cole remembered hearing the turn signal, but he could not recall exactly when Carter activated the turn signal. (*Id.* at 12:1–5, 26:2–4.) In response to questions from the Court about where he heard the turn signal, Cole recalled texting on his phone while the Dodge Charger was at a traffic light.

At the suppression hearing, both sides questioned Cole as to where he last heard the turn signal: the left-hand turn from traffic light at the intersection of William Penn Highway and Old Haymaker Road or the right-hand turn on to the ramp leading to Interstate 376.[9] (*Id.* at 42:2–3, 43:10–13, 49:23–50:2.) On redirect examination, Cole's testimony indicated that the last place he heard the Dodge Charger's distinctive turn signal noise was when the Dodge Charger made the left-hand turn at the traffic light on the corner of William Penn Highway onto Old Haymaker

---

[9] The left-hand turn from William Penn Highway onto Old Haymaker Road occurs prior to the righthand on-ramp that leads to Interstate 376, which is where Sergeant Krut testified that he witnessed the Dodge Charger change lanes without signaling. (Gov't's Ex. 1.)

Road. (*Id.* at 49:3–51:5.) Defense counsel asked Cole whether he could "definitively say that [the left-hand turn at the William Penn Highway-Old Haymaker Road intersection] was the last time [he] heard the turn signal." (*Id.* at 50:3–6.) Cole responded: "I just remember hearing a turn signal at one point in time and that was the last time I heard the turn signal when we were at that light to make the left but I don't know exactly when he put it on." (*Id.* at 50:7–11.) Earlier, on cross examination, Cole similarly testified that the left-hand turn at the traffic light was the last place he heard the turn signal. (*Id.* at 43:6–13.) There, the Assistant United States Attorney asked Cole whether the "left-hand turn is the last time [he] remember[ed] hearing the audible sound [he] associate[d] with the turn signal." (*Id.* at 4310–12.) Cole answered: "Yes." (*Id.* at 43:13.)

Once pulled over, the officers asked Cole and Carter for identification, and an officer "went back" to his vehicle to run Cole and Carter's names through a law enforcement database. (*Id.* at 14:5–9.) Cole recalled being asked for consent to search the vehicle. (*Id.* at 14:9–10.) At the point where Cole was patted down, the officer told him to put his hands on the car, shook Cole's waist and continued to pat down his ankles, and then "came up and patted between [Cole's] legs and then he used his hand to hit between [Cole's] legs."[10] (*Id.* at 15:22–16:4, 16:21–17:22.) Cole experienced discomfort as the baggy was up against his body at the time.[11] (*Id.* at 17:13–15.) Then the officer transitioned to a "cupping" position as he "tr[ied] to feel" the contents of the baggy by wrapping his fingers around it. (*Id.* at 18:2–16.) Cole's testicles moved when the officer touched the baggy, and Cole could feel the officer's fingers moving in his "testicular area." (*Id.* at 18:21–22:2.) Cole was not new to police pat downs, but he had not

---

[10] During his testimony at the suppression hearing, Cole demonstrated the officer's pat down technique by moving his arm and hand like a blade in an upward chopping motion. Cole stated that the officer used this blade-style pat down technique upward toward his crotch several times, specifically in the area between his legs and behind or up against his testicles. (*Id.* at 15:22–16:4, 16:21–17:22.)

[11] Cole used the term "package" to describe the non-anatomical item inside his boxer briefs. To avoid confusion between the item and any male anatomy, the Court will use the term "baggy" to describe the non-anatomical item that was retrieved from Cole's underwear.

previously experienced a pat down that focused on his testicles or where the officer patted so high up his inner leg. But Cole also acknowledged that he had never been patted down prior to this incident because a police officer had observed an unnatural bulge in his pants. (*Id.* at 19:9–21, 23:4–22.)

While the officer's hands were "cupped and he was feeling" the baggy, the officer asked Cole about the baggy's contents. (*Id.* at 20:15–20.) At first, Cole did not answer the officer. (*Id.* at 20:18–22.) But when presented with the choice of answering the question about the baggy or having the officer "go down there and get it [him]self," Cole admitted to the officer that he had bricks of heroin in his pants. (*Id.* at 20:23–25, 21:1–19.) Cole then "reached down into [his] pants" and retrieved the baggy. (*Id.* at 21:7–12.)

On the day in question, Cole was wearing boxer brief underwear, which he described as "kind of like compression shorts" that are "tight on your body." (*Id.* at 14:12–23.) Over his boxer brief underwear, he was wearing basketball shorts. (*Id.* at 14:12–14.) And over his basketball shorts he was wearing gray sweatpants. (*Id.*) Sometime prior to entering the Dodge Charger, Cole placed the baggy in his boxer briefs, and he did not move it around or grab it once he noticed the police lights. (*Id.* at 47:7–24.) Acknowledging that he was dressed for the occasion, Cole stated that he chose the multilayered wardrobe "[b]ecause of what [he] had inside [his] sweatpants." (*Id.* at 15:9–16.) When asked if a police officer could have seen a bulge in his pants, Cole responded that it would have been "virtually impossible" to see such a bulge under his three (3) layers of clothing while he was sitting down because he was sitting "on top of" the baggy.[12] (*Id.* at 48:14–16.)

---

[12] During his testimony at the suppression hearing, Cole placed an eight-ounce, stubby (approximately 2.5-inch by 3.5-inch cylinder) disposable water bottle underneath his body as he sat in the witness stand, seemingly in an effort to demonstrate where the baggy was. Such a small, retail eight-ounce water bottle is, of course, much smaller than a

## III. <u>DISCUSSION</u>

Cole and Carter point to four (4) alleged constitutional errors, which they argue require suppression of all of the evidence against them. First, they argue that the initial traffic stop conducted by Sergeant Krut and Detective Maritz was unlawful. Second, they argue that Sergeant Krut's pat down of Cole violated his Fourth Amendment rights. Third, they seek to suppress any statement made by Cole during and after the pat down as a violation of his *Miranda* rights. And finally, they argue that the search warrant executed by police at the Northern Pike Apartments lacked probable cause. For the reasons that will follow, Carter and Cole come up short on all counts, and their Motion to Suppress is denied.

### A.    <u>The Traffic Stop</u>

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop for a suspected violation of law is a "seizure" of the vehicle's occupants and must be conducted in accordance with the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255–59 (2007). But even though the Fourth Amendment generally requires a warrant before the government may seize a person, officers are permitted to conduct brief investigatory stops, *Terry v. Ohio*, 392 U.S. 1, 88 (1968), so long as they have "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Which is to say that the officers must have "a particularized and objective basis for suspecting the particular person stopped" of unlawful conduct. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). And in *United States v. Delfin-Colina*, the Third Circuit expressly adopted "reasonable suspicion," not "probable cause," as the applicable standard when examining the lawfulness of a traffic stop. 464

softball, and is not spherical in shape, so its placement and anatomical displacement were not in the Court's personal visual assessment at all like sitting on a softball. (ECF No. 110, at 44:5–46:12.)

F.3d 392, 396–97 (3d Cir. 2006); *see United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) ("Traffic stops are classified as a type of *Terry* stop, and may be initiated based on a reasonable suspicion that a traffic violation has occurred.").

Reasonable suspicion, particularly in the context of traffic stops, is not a high bar. As the Supreme Court put it: "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion . . . require[d] is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (internal quotation marks and citations omitted). Any "articulable facts that an individual was violating a traffic law at the time of the stop," therefore, will satisfy the constitutional requirement. *Delfin-Colina*, 464 F.3d at 398. And the Supreme Court has made abundantly clear that an officer's "actual motivations" for making the traffic stop "play no role" in the court's constitutional analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996); *Delfin-Colina*, 464 F.3d at 398 ("[A] court should only look to whether specific, articulable facts produced by the officer would support reasonable suspicion of a traffic infraction.").

While the Fourth Amendment principles above inform what rights an individual possesses, it is equally important to ask who may assert those rights in court. It is often said that "Fourth Amendment rights are personal." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). The consequence being that they "may not be asserted vicariously." *Id.* And while this concept is sometimes referred to as "Fourth Amendment standing," the title is a bit of a misnomer. *See United States v. Mosley*, 454 F.3d 249, 253 n.5 (3d Cir. 2006). Instead of "standing" in the jurisdictional sense, "the 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." *Id.*; *see also United States v. Stearn*, 597 F.3d 540, 551 & n.11 (3d Cir. 2010) ("Fourth Amendment

'standing' is one element of a Fourth Amendment claim, and does not implicate federal jurisdiction.").

The Fourth Amendment provides protection against two (2) distinct threats: unreasonable searches and unreasonable seizures. When traffic stops are involved, the "Fourth Amendment standing" inquiry can turn on which of these protections the defendant invokes. The traffic stop of a vehicle, as has already been noted, is a seizure. And that seizure is often, but certainly not always, accompanied by a search of the automobile. Determining whether the search of a vehicle was lawful involves a separate inquiry from determining whether the initial seizure was lawful. It is here where the "standing" inquiry can diverge. A defendant may have Fourth Amendment "standing" to challenge the lawfulness of the initial traffic stop (i.e., the seizure), but lack "standing" to challenge a search of the stopped vehicle. *See Mosley*, 454 F.3d at 253–55.

To have "standing," a defendant who challenges the *search* of a vehicle must "establish[] that he had a reasonable expectation of privacy in the property searched." *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (citing *Minnesota v. Olson*, 495 U.S. 91, 95–97 (1990)). That is, the defendant must have a subjective expectation of privacy, and that subjective expectation must be objectively reasonable. *Id.* (citing *Rakas*, 439 U.S. at 143–44). Thus, while the owner of a vehicle has "standing" to challenge a search of the vehicle, "passengers are generally held to lack 'standing' [because] a search of a car does not implicate the rights of non-owner passengers." *Mosley*, 454 F.3d at 253 (footnote and citation omitted). When it comes to vehicle searches, then, the owner-passenger distinction can be dispositive. And the same evidence recovered during a vehicle search may be constitutionally inadmissible against the vehicle's owner but freely admitted against the passenger.

As for a defendant who challenges his *seizure*, the "standing" inquiry is simple. "[A] Fourth Amendment seizure of every occupant of a vehicle occurs the moment that vehicle is pulled over by the police. The legality of the seizure depends upon the legality of the traffic stop." *Id.* at 253 n.6. The result being that every occupant of a vehicle—owner and passenger alike—has "standing" to challenge the lawfulness of a traffic stop. *Id.* And "when a vehicle is illegally stopped by the police, no evidence found during the stop may be used by the government against *any occupant* of the vehicle unless the government can show that the taint of the illegal stop was purged." *Id.* at 251 (emphasis added).

Finally, before turning to the specific claims in this case, it is worth a moment to discuss each party's burden of proof. When a defendant moves to suppress evidence, he bears the initial burden of establishing a basis for his motion. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013). The defendant's burden is easily satisfied when law enforcement conducted the challenged search or seizure without a warrant. *Johnson*, 63 F.3d at 245. Once the defendant makes that threshold showing, the burden shifts to the Government to prove by a preponderance of the evidence that the seizure was reasonable. *United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015) (citing *Johnson*, 63 F.3d at 245). So, if the Government fails to prove by a preponderance of the evidence that the officers had "a particularized and objective basis for suspecting the particular person stopped" of unlawful conduct, then the motion to suppress will be granted. *See Heien*, 574 U.S. at 60 (quoting *Navarette*, 572 U.S. at 396).

Here, because Sergeant Krut and Detective Maritz conducted the traffic stop without a warrant, Cole and Carter easily meet the threshold burden of establishing a basis for their motion. And, with respect to Cole and Carter's allegations that the traffic stop was unlawful,

both defendants have standing. *See Mosley*, 454 F.3d at 253 (holding that all occupants of a vehicle have standing to challenge a traffic stop of that vehicle). With that, the burden shifts to the Government to prove that the seizure was reasonable.

To prove that the traffic stop conducted by Sergeant Krut and Detective Maritz was supported by reasonable suspicion, the Government must establish articulable facts that Carter committed a traffic violation while driving the Dodge Charger on June 30. *Delfin-Colina*, 464 F.3d at 398. To do so, the Government relies on Sergeant Krut's testimony that he personally observed the Dodge Charger change lanes "to get on to the exit ramp without signaling." (ECF No. 91, at 78:6–16.) The failure to signal before changing lanes is of course a violation of Pennsylvania's Motor Vehicle Code. *See* 75 Pa. Cons. Stat. § 3334(b). Sergeant Krut testified at the suppression hearing that he could not recall whether there were any vehicles between him and the Dodge Charger at the time he witnessed the violation. (ECF No. 91, at 82:21–25.) But he further testified that he could see the right taillight and was "watching to see if [the defendants] properly signaled." (*Id.* at 83:7–10.) When asked, Sergeant Krut unequivocally stated that he did not see the Dodge Charger signal before changing lanes. (*Id.* at 83:11–12.) And immediately after witnessing the failure to signal, Sergeant Krut advised Detective Maritz of what he saw and called into police dispatch to inform them that he was initiating the stop. (*Id.* at 83:20–84:8.) Detective Maritz's testimony is consistent with Sergeant Krut's recollection that he advised Detective Maritz of the Dodge Charger's failure to signal as it turned on to the on-ramp. (ECF No. 107, at 17:20–22.)

Sergeant Krut's account of the failure to signal is consistent with his earlier testimony that he and Detective Maritz planned to watch Defendants' vehicle and make a stop if they witnessed a traffic violation. (ECF No. 91, at 147:23–24.) Sergeant Krut testified that, prior to

seeing the failure to signal, he and Detective Maritz trailed Defendants' Dodge Charger through several intersections without observing any traffic infractions. (*Id.* at 76:24–78:16.) In a similar vein, even though Sergeant Krut suspected that the smoke coming from the Dodge Charger in the Buffalo Wild Wings parking lot was the product of marijuana use, he "didn't feel that [he] had probable cause to stop th[e] car for marijuana being in the vehicle." (*Id.* 107:11–16.) It was only when Sergeant Krut witnessed the failure to signal that he initiated a traffic stop.

Carter and Cole argue that the Government has not met its burden. They center their arguments on the assertion that Sergeant Krut was not credible when he testified that he observed the Dodge Charger fail to signal a lane change.[13] Carter and Cole's point being that no traffic violation means no reasonable suspicion, and no reasonable suspicion means that all of the evidence gathered by Sergeant Krut and Detective Maritz—from the Dodge Charger, Cole's boxer briefs, and the Apartment—is "fruit of the poisonous tree." (ECF No. 115, at 13.) Because the Court sits as the fact finder on a motion to suppress, the Court must make a credibility determination as to Sergeant Krut's testimony that he personally observed the Dodge Charger fail to signal when it changed lanes on June 30. On this issue, the Court finds Sergeant Krut's testimony to be credible.

In their post-hearing briefs, the Defendants correctly point out that Sergeant Krut's testimony, at times, related more to his standard practice than necessarily to the specific events of June 30.[14] (ECF No. 118, at 14–15.) But on the critical issues of when, where, and how he

---

[13] Neither Defendant challenges the fact that "[p]olice officers are permitted to pull over a car suspected of violating any applicable vehicular traffic laws." (Carter Post-Hr'g Br., ECF No. 115, at 13; Cole Post-Hr'g Br., ECF No. 118, at 13.) Rather, Carter and Cole challenge the credibility of Sergeant Krut's testimony that he actually observed the traffic violation prior to performing the traffic stop. (EFC No. 115, at 13–17; ECF No. 118, at 14–16.)

[14] Defendants also point to the number of times Sergeant Krut's used his investigative notes to refresh his recollection as evidence that his testimony should not be credited. The fact, however, that Sergeant Krut used his notes multiple times during testimony that lasted several hours and occurred over one-and-a-half years after the relevant events, is not a strong enough reason to discount his testimony.

witnessed the Defendants' traffic violation, Sergeant Krut's testimony was both specific and credible. Sergeant Krut testified that his focus was trained on the Dodge Charger's right taillight. Carter and Cole argue that if there was a car between Sergeant Krut's vehicle and theirs, then Sergeant Krut "likely" would not have been able to see the taillight. (*Id.* at 16.) But that argument simply invites the Court to substitute speculation for the credible testimony of Sergeant Krut.

Defendants' other argument is based on Cole's testimony that he heard the Dodge Charger's distinctive turn signal sound shortly before he saw flashing lights behind him and Carter.[15] (ECF No. 115, at 15–16.) Yet Cole, with laudable candor, acknowledged that he did not know exactly where the vehicle was when he heard the turn signal at the critical point. (ECF No. 110, at 27:12–29:9.) Cole testified that Carter claimed to have properly signaled. (*Id.* at 11:22–25.) But Cole himself could not testify definitively to that fact. Rather, when asked directly whether he could say with certainty that Carter used the turn signal, Cole responded: "I can't say he definitely used it, no." (*Id.* at 28:6–8.)

What's more, Cole's testimony strongly suggested that the last place he heard the turn signal was when the Dodge Charger turned left at the traffic light on the corner of William Penn Highway and Old Haymaker Road. (*Id.* at 42:2–3, 43:10–13, 49:23–50:11.) That left-hand turn occurred prior to the right-hand entrance to the on-ramp leading to Interstate 376. (Gov't's Ex. 1.) And it was Sergeant Krut's testimony that he witnessed the failure to signal during that second turn—the right-hand turn on to the on-ramp—not the earlier left-hand turn at the traffic light where Cole said he remembers hearing the turn signal noise. (ECF No. 91, at 78:8–17.)

---

[15] During his testimony, Defendant Cole testified that the Dodge Charger's turn signal had a distinctive "[f]uturistic sound." (ECF No. 110, at 12:11.)

The Court finds Cole's testimony to be credible but insufficient. Sergeant Krut and Cole's testimony can be and are read consistent with each other's. Sergeant Krut, on the lookout for any traffic infraction in order to initiate a stop, focused intently on the Dodge Charger's taillight. Cole, a passenger in the Dodge Charger, was not intensely focused on Carter's use of the turn signal and admitted to looking at his phone and texting during the relevant time period. Whereas Sergeant Krut could say for sure where he saw the Dodge Charger change lanes without signaling, Cole was unable to testify with similar certainty.

Having credited Sergeant Krut's testimony that Defendants' committed a traffic infraction, the Court concludes that Sergeant Krut provided specific, articulable facts that provided reasonable suspicion of a traffic infraction. For that reason, the traffic stop of Defendants' vehicle was lawful, and their seizure reasonable.

## B.    The Pat Down

Having concluded that the initial traffic stop of Carter and Cole's vehicle was lawful, the Court must turn to the second question in this case: Was Sergeant Krut's pat down of Cole lawful? The Court concludes that it was.

When tasked with determining the lawfulness of a pat down that uncovers some non-weapon contraband, the Court's inquiry proceeds in two (2) parts. First, the Court must ask whether the officer had reasonable suspicion to even conduct the pat down in the first place. If the answer to that question is "yes," the Court must then ask whether the officer's pat down exceeded the scope permitted by the Fourth Amendment.

### i.  *Reasonable Suspicion*

On the question of whether the officer reasonably believed the suspect was armed, *Terry v. Ohio* and its progeny again provide the constitutional standard. 392 U.S. at 27. *Terry* held that

an officer may conduct a limited search for weapons when "he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* To justify the pat down of a suspect during a *Terry* stop, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27. There is no requirement that the officer "be absolutely certain that the individual is armed." *Id.* Instead, the officer must simply point to "specific and articulable facts" warranting the pat down for weapons. *Id.* at 21; *see also United States v. Murray*, 821 F.3d 386, 392–94 (3d Cir. 2016); *United States v. Yamba*, 506 F.3d 251, 254–56 (3d Cir. 2007). The officer's reasonable belief that the suspect is armed must arise prior to initiating the pat down. *See Ybarra v. Illinois*, 444 U.S. 85, 92–93 (1979).

"Reasonable suspicion does not require that the suspect's acts must always be themselves criminal." *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000). As the Court conducts its reasonable suspicion inquiry, it must look at all of the circumstances surrounding the stop. *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984). This includes "giving due weight to the experience of the officers." *Id.* (first citing *United States v. Cortez*, 449 U.S. 411, 418 (1981); then citing *Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979)); *see United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014). Consequently, the Third Circuit has held that "considerable deference" should be given "to police officers' determinations of reasonable suspicion." *Mosley*, 454 F.3d at 252. Among the relevant factors that an officer can rely on is whether the defendant was coming from a high crime area at the time of the *Terry* stop. *See Wardlow*, 528 U.S. at 124. Officers may also consider the defendant's demeanor during the stop. *Id.* ("[N]ervous, evasive behavior is a pertinent factor."). And when the *Terry* stop is related to a drug investigation, there is even

greater reason for an officer to believe that the suspect could be armed. *United States v. Davis*, 726 F.3d 434, 440 (3d Cir. 2013) (noting that "drug dealers often carry guns").

On the first issue—whether Sergeant Krut had a reasonable belief that Cole was armed—Cole and Carter argue that Sergeant Krut's pat down of Cole was unlawful under *Terry v. Ohio*.[16] (ECF No. 118, at 17.) As Cole puts it, Sergeant Krut did not have a reasonable belief that he was armed and dangerous. Cole hangs his arguments on three (3) main points. First, he argues that nothing about the reason for the stop—a relatively minor traffic violation—would give rise to a reasonable belief that he was armed. (*Id.* at 17–18.) Second, Cole argues that Sergeant Krut was unable to point to specific and articulable facts that would support the reasonable belief that he was armed. (*Id.* at 18–19.) Third, Cole argues that any information Sergeant Krut received from Officer Frisk and Mr. Malik also could not rise to the level of a reasonable belief that he had a weapon. (*Id.* at 19–21.)

The Government, still bearing the burden of proof, argues that the totality of the circumstances presented Sergeant Krut and Detective Maritz with a reasonable belief that Cole might be armed. (ECF No. 128, at 19.) Specifically, the Government points to Cole and Carter's association with the Northern Pike Apartments complex—an area known for drug activity—the officers' training and experience with narcotics trafficking, Carter's nervousness, Cole's probation status, and the unnatural bulge that Detective Maritz spotted in Cole's pants. All of

---

[16] Defendant Carter joined Defendant Cole's motion to suppress in whole. (ECF No. 51.) But Defendant Carter, in the Court's estimation, does not have Fourth Amendment standing to challenge the pat down of Defendant Cole. It cannot seriously be said that Carter subjectively claims an expectation of privacy in the contents of Cole's boxer briefs. Nor would such a belief be considered reasonable. *See, e.g., Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980). And yet, because the Court concludes that Sergeant Krut's pat down of Cole was lawful under Supreme Court and Third Circuit precedent, the Court need not decide whether Carter has standing to challenge Sergeant Krut's pat down of Cole. *Accord United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 215 (3d Cir. 1998) (observing that Fourth Amendment standing, unlike Article III standing, is not a threshold inquiry that must be evaluated before a federal court may turn to the merits of a case).

that, the Government argues, provides the necessary specific and articulable facts to support a pat down to check Cole for weapons. (*Id.* at 19–25.)

The Court concludes that Sergeant Krut possessed a reasonable belief that Cole might be armed. During his testimony at the suppression hearing, Sergeant Krut provided specific and articulable facts that would lead a reasonable person to that conclusion. When asked to describe what factors led him to believe that Cole might have a weapon, Sergeant Krut specifically pointed to (1) the information received from Officer Frisk; (2) the fact that, in his experience, drug dealers often carry firearms; (3) that the Northern Pike Apartments—where Cole had been shortly before the traffic stop—was known for drug activity and "violence;" and (4) the fact that Cole said he was on federal probation. (ECF No. 91, at 92:20–93:10.)

The parties' post-hearing briefs make much ado about the alleged "unnatural bulge" that Detective Maritz said he saw in Cole's pants. Cole, during his testimony, claimed that it would have been "virtually impossible" for Detective Maritz to see the bulge under his tri-layered garb. (ECF No. 110, at 48:14–16.) The Court, however, finds Detective Maritz's testimony to be credible. When he was on the stand, Detective Maritz unequivocally testified that he saw the bulge in Cole's pants. What's more, Detective Maritz told Sergeant Krut that he saw the bulge in Cole's pants immediately after seeing it. That in-the-moment corroboration is strong evidence that Detective Maritz testified truthfully when he claimed to have seen the bulge.

It is also reasonable that Detective Maritz saw a bulge, since the package secreted in Cole's pants was roughly the size of a softball.[17] Cole vigorously asserted that the baggy was

---

[17] During the Government's direct examination of Sergeant Krut, the Court admitted Government's Exhibit 3, which is a photograph of the baggy with the bricks of heroin placed directly next to the folded-up paper currency that the officers recovered from Cole's person. (Gov't's Ex. 3.) Using the folded-up paper currency in the photograph for scale, the Court has estimated that the diameter of the baggy is roughly four (4) inches. An official National Collegiate Athletic Association ("NCAA") softball can have a diameter anywhere from 3.78 inches to 3.90 inches. *See* NCAA, *2018 and 2019 NCAA Softball Rules* (Oct. 2017) (Rule 3.2.1). So Sergeant Krut and Detective Maritz

"under [his] testicles" and therefore it would have been "impossible to see a bulge." (*Id.* at 25:1–2.) Notwithstanding Cole's efforts to tuck the baggy away, given the geometry of the baggy and the geography of its hiding spot, the Court finds and concludes that Maritz likely did see a bulge in the front of Cole's pants. Whether that bulge was the baggy itself or something else—e.g. the nether reaches of Cole's genital anatomy being thrust forward and upward by the softball-sized ball of heroin Cole says he was sitting on—is irrelevant. The fact that Cole tried his hardest to hide the baggy under his genitals does not mean that he was successful. Cole might have thought that it would be virtually impossible someone would see the baggy, but the evidence (particularly the size of the heroin-laden baggy combined with Detective Maritz's swift, credible, and immediate exclamation of seeing the bulge) indicates that Cole turned out to be wrong.

Viewing Sergeant Krut and Detective Maritz's testimony in the totality of the circumstances, and with appropriate deference to their knowledge and experience, there was more than enough reason for them to suspect that Cole possessed a weapon. *See Mosley*, 454 F.3d at 252; *Rickus*, 737 F.2d at 365. After all, Sergeant Krut did not need to be "absolutely certain" that Cole had a weapon. *Terry*, 392 U.S. at 27. The factors articulated by Sergeant Krut are consistent with both Supreme Court and Third Circuit case law. The Supreme Court has held that presence in a high crime area is a relevant factor when considering if a suspect may be armed. *Wardlow*, 528 U.S. at 124. In Sergeant Krut's experience, the Northern Pike Apartments were known for drug activity and violence. And the law enforcement surveillance prior to the stop observed a series of odd events: (1) Mr. Malik's rent complaint; (2) the swift cash payment; (3) the names not on the lease; (4) the out-of-state car frequently coming and going; and (5) the in-and-out short-time visitors to Building E.

---

were right on the money when they each testified that the baggy full of heroin was roughly the size of a softball. (ECF No. 91, at 99:15–17; ECF No. 107, 23:23–24:20.)

In the same vein, as the Third Circuit has acknowledged: where there are drugs, there are often guns. *See Davis*, 726 F.3d at 440. So the information that Sergeant Krut received from Officer Frisk and Mr. Malik about suspected drug activity associated with Cole's apartment building contributed to a reasonable fear that Cole may have a weapon. And the driver, Carter, was visibly nervous when speaking to the officers. *Accord Wardlow*, 528 U.S. at 124. All of this, coupled with Cole's status on federal probation and Detective Maritz's warning that he saw an unnatural bulge in Cole's pants properly raised red flags for Sergeant Krut.[18]

### ii. Scope of the Pat Down

As for the second part of its inquiry—having concluded that the officer had reasonable suspicion that the suspect was armed—the Court must ask whether the officer exceeded the scope of the limited search allowed under *Terry*. *See Yamba*, 506 F.3d at 256 (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). Although the purpose of a pat down must be circumscribed to searching for weapons, an officer need not turn a blind eye to some other form of contraband that he discovers during a valid weapons search. *See, e.g., id.* at 256–60. If the officer's pat down exceeds the scope of *Terry*'s limited search for weapons, however, then any evidence recovered by the officer will be suppressed. *See id.* at 256.

This is where the so-called "plain feel" doctrine comes into play. In *Minnesota v. Dickerson*, the Supreme Court held that an officer may lawfully seize contraband that he finds during a pat down of a suspect's outer clothing so long as the contraband either feels like a weapon or it is "immediately apparent" that what he feels is contraband. 508 U.S. 366, 375 (1993). If the officer develops probable cause to believe what he felt is contraband by the time he

---

[18] The Court also notes that, in its judgment, whether or not Detective Maritz saw the bulge, the remaining evidence and context, as noted above, is itself sufficient to justify Sergeant Krut's pat down of Cole for weapons. The Court, for the reasons set out above, credits Detective Maritz and Sergeant Krut's testimony that Detective Maritz saw the bulge and told Sergeant Krut about the bulge prior to Cole's pat down.

realizes it is not a weapon, then the officer can conduct a more intrusive search. *Id.* at 372–73. And if the item is in fact contraband, then the officer can seize the item and arrest the suspect. *Id.* It is only when the officer "goes beyond what is necessary to determine if the suspect is armed" that the "fruits [of the pat down] will be suppressed." *Id.* at 373.

As our Court of Appeals noted in *United States v. Yamba*, often the fight over "plain feel" is how "immediately" the officer knew he discovered contraband, how certain the officer was that he found contraband, or exactly how much patting, poking, and prodding the officer engaged in. *See* 506 F.3d at 258. But the *Yamba* Court rejected a narrow focus on immediacy, certainty, and the extent of the officer's manipulation. Instead, the Third Circuit centered the "plain feel" analysis on a different factor: timing. As the Third Circuit read *Dickerson*, the dispositive question when it comes to "plain feel" is "what the officer believes the object is by the time he concludes that it is not a weapon." *Id.* at 259. So, when determining whether the scope of a pat down was proper, "the areas of focus should be whether the officer had probable cause to believe an object was contraband before he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk." *Id.* (citing *United States v. Jones*, 303 F. Supp. 2d 702, 706 (D. Md. 2004)).

The facts of *Yamba*, our Circuit's seminal "plain feel" decision, are helpful in this case. In *Yamba*, an officer encountered three (3) men in a U-Haul truck that was parked at a gas station blocking an entrance from the street. *Id.* at 253. As he approached, the officer saw that one (1) of the men had an open pocketknife and the other two (2) were making furtive movements below the dashboard, so he initiated a *Terry* stop. *Id.* The officer handcuffed the man with the knife and put him in the officer's patrol car. *Id.* at 253–54. The officer then turned his attention to the remaining two (2) men. Reasonably believing that they might also be armed, the officer began a

pat down of the defendant. *See id.* During the pat down, the officer "'felt around' or otherwise 'manipulated' the contents of [the defendant's] pocket in the process of checking for weapons when he came across what in his experience could be contraband"—specifically, marijuana. *Id.* at 259–60.

As the Third Circuit put it: "It is not key whether [the officer] was certain that the object in [the defendant's] pocket was contraband by the time he knew it not to be a weapon." *Id.* at 260. Instead, "what is key is whether [the officer] had probable cause to believe that it was [contraband] and this occurred *at the same moment or before* he determined that [the defendant] had no gun on his person." *Id.* (emphasis added). The Third Circuit affirmed the District Court's conclusion that probable cause existed before the officer exceeded *Terry*'s permissible scope. Probable cause in *Yamba* existed when the officer felt "a plastic bag containing a soft[,] spongey-like substance." *Id.* (alteration in original) (internal quotation marks omitted). Although the baggy could have contained "grass or oregano," the officer did not need to be absolutely certain that he located marijuana. *Id.* (footnote omitted). And even though the officer conducted a more intrusive search to confirm that he found marijuana, "by that point [the officer] *already* had probable cause to conduct a more intrusive search than that authorized by *Terry* alone." *Id.*

Here, because the pat down of Cole recovered bricks of suspected heroin, not a weapon, the Court must analyze the scope of the pat down under the "plain feel" doctrine. Cole and Sergeant Krut's testimony leaves the Court convinced that the Government has met its burden.

The dispositive question, when it comes to the "plain feel" doctrine, is whether the officer developed probable cause that the item he felt was contraband by the time he determined it was not a firearm. *Yamba*, 506 F.3d at 259. Sergeant Krut testified that he used standard protocol when patting down Cole on June 30, 2017. (ECF No. 91, 93:14–94:4, 131:18–133:5.) He

visually surveyed Cole to "see if anything [stood] out," then patted the pocket areas of Cole's outerwear. (*Id.* at 93:17–19.) Next, Sergeant Krut went up Cole's leg in a "quick[]" motion, which, as Sergeant Krut described it, was meant to detect "some heavy item, [like] steel, [or a] firearm." (*Id.* at 94:10–11, 132:14–18.) All of this is well within the proper scope of a pat down to find weapons on a suspect. As Sergeant Krut patted down the inside of Cole's upper leg, he "felt something angular," which he knew was not part of Cole's anatomy. Sergeant Krut testified that he "instantly" knew that the item his hand hit was bricks of heroin. (*Id.* at 95:15.) His instant recognition of the item as heroin was due to the location of the item on Cole's person and Sergeant Krut's knowledge that "bricks of heroin are often packed with rubber bands" forming an "angular shape" like that of the item he discovered. (*Id.* 95:2–13.)

In his post-hearing brief, Cole argues that Sergeant Krut did not immediately know that the item he felt in Cole's pants was heroin. (ECF No. 118, at 26–27.) Never mind that Sergeant Krut testified that he "instantly" knew he found contraband, (ECF No. 91, at 95:15), our Court of Appeals in *Yamba* held that the "plain feel" doctrine does not turn on the immediacy of the officer's realization alone. *See Yamba*, 506 F.3d at 259. Cole also argues that Sergeant Krut merely "thought" he found heroin—implying that Officer Krut's level of certainty invalidates the pat down. (ECF No. 118, at 27–28.) But *Yamba* also disavowed the notion that certainty is any more important than immediacy when it comes to the Court's plain feel analysis. *Yamba*, 506 F.3d at 259.

Instead, the key factor under the "plain feel" doctrine, the Third Circuit instructed in *Yamba*, is timing. So, what did Sergeant Krut know and when did he know it? By his own testimony, Sergeant Krut determined that the item in Cole's pants was (1) bricks of heroin, and (2) not a firearm at (3) approximately the same time. (ECF No. 91, at 94:20–22, 95:14–15,

133:12–14.) Sergeant Krut's near concurrent realizations are consistent with the Third Circuit's holding in *Yamba*. *See Yamba*, 506 F.3d at 259 (asking whether the officer developed probable cause "at the same moment or before" he determined the suspect was unarmed). After all, Sergeant Krut realized that he found drugs, not a gun, in one fell swoop. It was not the case that Sergeant Krut realized he found drugs long after he realized he had not found a weapon. Instead, Sergeant Krut uncovered the suspected heroin using standard pat down procedure and developed probable cause that what he found was bricks of heroin. Once he had probable cause to believe there were drugs in Cole's pants, Sergeant Krut was entitled to undertake a more intrusive search—though Cole voluntarily retrieved the baggy from his boxer briefs.

Cole, for his part, testified that the pat down was more intrusive than Sergeant Krut's account. Cole remembered Sergeant Krut's blade-like chopping motion, which is consistent with Sergeant Krut's testimony. But the majority of Cole's testimony at the suppression hearing was about Sergeant Krut "cup[ping]" and wrapping his fingers around the baggy to "feel exactly what it was." (ECF No. 110, at 18:2–11.) Given its location, the Court certainly does not doubt that Cole was keenly aware of every tiny movement the baggy made. Cole's testimony, however, does not convince the Court that Sergeant Krut's pat down exceeded its lawful scope.

In essence, Sergeant Krut's pat down consisted of two (2) parts. First, the blade-like chopping motion—which Cole and Sergeant Krut both testified happened early in the pat down—was the initial *Terry* limited search for weapons supported by reasonable suspicion. Second, the cupping and feeling that Cole described was a more intrusive search permitted once Sergeant Krut developed probable cause to believe Cole had contraband on his person. Sergeant Krut's pat down, in this respect, mirrors the officer's pat down in *Yamba*. There, the officer conducted the initial limited search for weapons, realized he found marijuana (i.e., developed

probable cause), and then engaged in a more intrusive search to confirm his finding. Here, Sergeant Krut conducted an initial limited search for weapons on Cole, realized he found bricks of heroin (i.e., developed probable cause), and then engaged in the more intrusive cupping and grabbing that Cole described.

Cole and Sergeant Krut's testimony, taken together, leads the Court to conclude that the Government met it burden of proving that the pat down of Cole was supported by reasonable suspicion and did not exceed its lawful scope. Therefore, Defendants' Motion to Suppress the evidence stemming from Sergeant Krut's pat down is denied.

## C.     The Statements

Defendants also allege that law enforcement violated their rights under the Fifth Amendment's Self-Incrimination Clause.[19] (ECF No. 118, at 28.) Cole and Carter's *Miranda* arguments ask for two (2) forms of relief. First, they move to suppress Cole's "response to being questioned by law enforcement as to what was in his underwear." (ECF No. 118, at 29.) Second, Cole and Carter seek to suppress the "drugs confiscated as a result of that questioning." (*Id.* at 29–30.) On both points, the Defendants' motion is denied.

The Fifth Amendment's Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court crafted a prophylactic rule of criminal procedure intended to curtail coercive interrogation techniques. 384 U.S. 436 (1966). But the prophylactic rule set forth in *Miranda* only applies when a defendant is both in custody and interrogated. *See, e.g.*, *Estelle v. Smith*, 451 U.S. 454, 466–67 (1980).

---

[19] Again, because Carter joined Cole's motion to suppress in full, the Court treats the arguments set forth in the parties' briefing as being applicable to both Defendants. The Court, however, questions Carter's basis to assert Cole's Self-Incrimination Clause rights. But because the Court again concludes, on the merits, that the Defendants' Motion must be denied, the Court will pass on the opportunity to further evaluate Carter's ability to join Cole's Motion on this issue.

In short, a routine traffic stop does not constitute *Miranda* custody. *See Maryland v. Shatzer*, 559 U.S. 98, 113 (2010); *Berkemer v. McCarty*, 468 U.S 420, 437 (1984). *Miranda* must only be enforced "in those types of situations in which the concerns that powered the decision are implicated." *Berkemer*, 468 U.S. at 437. A restriction on the defendant's freedom of movement, while a necessary condition, is not sufficient to create *Miranda* custody. *See id.* Instead, *Miranda* "comes into play during a traffic stop 'as of the moment [the suspect is] formally placed under arrest.'" *United States v. Ley*, 876 F.3d 103, 109 (3d Cir. 2017) (alteration in original) (quoting *Berkemer*, 468 U.S. at 434). In particular, *Miranda* warnings are not required when the suspect is not handcuffed or otherwise restrained. *See Berkemer*, 468 U.S. at 440 (asking whether the motorist is in custody "for practical purposes" absent a formal arrest). When all that occurs, then, is a traffic stop followed by a *Terry* search, the suspect is not in *Miranda* custody. And absent *Miranda* custody, any statements made by the suspect may be used against him without running afoul of the Fifth Amendment.

*Miranda*, of course, was about using a defendant's unwarned statements against him at trial. The worry being that the "inherently compelling pressures" of custodial interrogation will overwhelm the suspect's capacity to remain silent. *Miranda*, 384 U.S. at 467. So, to protect the suspect's rights under the Self-Incrimination Clause, a prophylactic rule excluding unwarned statements is required. But the same cannot be said for the use of reliable physical evidence that is the fruit of a voluntary statement. *See United States v. Patane*, 542 U.S. 630 (2004) (plurality); *Patane*, 542 U.S. at 644–45 (Kennedy, J., concurring in the judgment).

In *Patane*, a fractured five-justice majority held that physical evidence recovered as a result of an unwarned voluntary statement was admissible. Justice Thomas, writing the plurality opinion for himself and two (2) other Justices, broadly concluded that "[t]he Self-Incrimination

Clause . . . is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.* at 636. Justices Kennedy and O'Connor concurred in the judgment, but took a narrower view. In their estimation, the trustworthy and probative nature of the physical evidence outweighed the value of deterrence through suppression. *Id.* at 645 (Kennedy, J., concurring in the judgment). Although the Third Circuit has not yet, in a precedential opinion, held what part of *Patane* is binding law, a number of other courts of appeals have. *See, e.g., United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir. 2007); *United States v. Renken*, 474 F.3d 984, 988 (7th Cir. 2007); *United States v. Phillips*, 468 F.3d 1264, 1266 (10th Cir. 2006); *United States v. Brathwaite*, 458 F.3d 376, 382 n.7 (5th Cir. 2006). The prevailing view is that "the *Patane* plurality and concurrence agreed, at least, that *Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement." *Jackson*, 506 F.3d at 1361.

Here, the Court will first address the Defendants' motion to suppress Cole's statements. As the Court already noted, Sergeant Krut and Detective Maritz pulled Cole and Carter over for a traffic violation—which amounts to a *Terry* stop. As the Defendants acknowledge, the Supreme Court in *Berkemer* held that a traffic stop does not, by itself, place the individuals stopped in *Miranda* custody. (ECF No. 118, at 28–29.) And without custody, the *Miranda* prophylactic rule is never implicated.

Sergeant Krut testified that when Cole stated that he had heroin in his pants, Cole had not yet been handcuffed or arrested. Instead, Sergeant Krut's conduct toward Cole—which is thoroughly discussed above and does not need repeating in full—was consistent with a *Terry* stop. Cole, indisputably, was not placed under formal arrest before he made the incriminating statements. Nor was he under the functional equivalent of a formal arrest, as he was standing

outside of the Dodge Charger, unhandcuffed. Because Cole was not in custody for the purposes of *Miranda*, the voluntary statements he made to Sergeant Krut need not be suppressed.

As for the physical evidence recovered following Cole's statement, the Court's task is even easier. First, even assuming for the sake of argument that physical evidence should sometimes be suppressed to remedy a *Miranda* violation, Cole was not in custody so there is no *Miranda* violation to remedy. Second, Sergeant Krut already discovered and identified the suspected heroin in Cole's pants at the time Cole made the incriminating statements. Regardless, then, of whether the tree was poisonous or pristine, the physical evidence was not its fruit. Third, even assuming—in the light most generous to the Defendants—that Cole was in custody, that his unwarned incriminating statement must be suppressed, and that Sergeant Krut found the drugs because of Cole's statement, the physical evidence is still admissible. Although the Third Circuit has not addressed *Patane* in a precedential decision, the Court agrees with the Eleventh Circuit's articulation of *Patane*'s holding in *United States v. Jackson*. 506 F.3d at 1360–61. Under the operative holding in *Patane*, the drugs recovered from Cole's boxer briefs are admissible as reliable and probative evidence. *See Patane*, 542 U.S. at 644–45 (Kennedy, J., concurring in the judgment).

Because Cole was not in custody, neither his statements nor the heroin found in his boxer briefs must be suppressed. What's more, even if Cole had been in custody, the deterrence value of suppression is outweighed by the reliable and probative nature of the physical evidence Cole seeks to suppress—namely, the ten (10) bricks of heroin. *See id.* For these reasons, Defendants' Motion to Suppress Cole's statements and the bricks of heroin is denied.

**D.    The Warrant**

Finally, Carter and Cole move to suppress the fentanyl and firearms obtained when officers executed a search warrant at the Northern Pike Apartments. Because the Court concludes that the warrant was lawfully issued and executed, the Defendants' motion is denied.

The Warrant Clause of the Fourth Amendment provides: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause must be inferred from the "totality-of-the-circumstances." *Illinois v. Gates*, 462 U.S. 213, 230 (1983). There is no quick and tidy way to define probable cause. Instead, the Supreme Court held that probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Id.* at 232. The magistrate judge is tasked with determining whether there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. When a district court reviews the issuing magistrate judge's probable cause decision, the court should simply ask whether the magistrate judge had a substantial basis for finding probable cause. *See id.* at 236.

The Warrant Clause requires a connection between the officer's probable cause and the particular place to be searched. The clause, therefore, "precludes the search of a home lacking a 'nexus' to the alleged crimes." *Stearn*, 597 F.3d at 558. But the Third Circuit specifically held that "even if another location is an equally likely repository of evidence, a magistrate may infer probable cause to search the drug dealer's home so long as the affidavit establishes a nexus between the dealer's home and the crime under investigation." *Id.* at 560. So if the magistrate concludes that there is a fair probability that contraband will be found in a residence, then the Warrant Clause's requirements are met. *See id.* (citing *Gates*, 462 U.S. at 238).

Carter and Cole's first argument, with respect to the warrant to search the Apartment, is that the warrant was not supported by probable cause. But there was plenty of probable cause to support the warrant. And this is especially true considering the fact that the Court owes appropriate deference to the magistrate judge's probable cause determination. *Gates*, 462 U.S. at 236 (requiring only that the magistrate judge's determination have a "substantial basis").

The affidavit authored by Detective Maritz fully conveyed the totality-of-the-circumstances to the magistrate judge. Detective Maritz noted his lengthy experience in law enforcement—including his training in narcotics investigations and drug identification. (Gov't's Ex. 5.) He recounted how Officer Frisk told him and Sergeant Krut of Mr. Malik's suspicions about drug dealing in Building E—and specifically the Apartment. (*Id.*) He noted that the Northern Pike Apartments are considered a "high crime/drug area." (*Id.*) And that when Officer Frisk responded to a call from Mr. Malik about overdue rent, Officer Frisk personally witnessed Cole hand Mr. Malik the rent money in cash for the Apartment. (*Id.*)

Detective Maritz then recounted his and Sergeant Krut's own surveillance on June 30, 2017. (*Id.*) He specifically mentioned seeing three (3) men leave Building E and get into the black Dodge Charger—one (1) of the men later getting out at the Buffalo Wild Wings. (*Id.*) And later in the day Sergeant Krut saw the Dodge Charger change lanes without signaling, causing Sergeant Krut to initiate a traffic stop. (*Id.*) Detective Maritz's affidavit identified Semaj Carter as the driver and Alexander Cole as the passenger—both of whom stated that they "stay" at the Northern Pike Apartments. (*Id.*) And he recounted Sergeant Krut's pat down of Cole that uncovered the bricks of heroin. (*Id.*) A later search of the Dodge Charger, Detective Maritz noted, uncovered a very small amount of marijuana. (*Id.*) And a search of Carter uncovered $1,040 in cash, while a search of Cole uncovered $800 in cash. (*Id.*)

Detective Maritz's affidavit then went on to say how Carter and Cole were arrested and transported to the Monroeville Police Station. (*Id.*) And Detective Maritz and Sergeant Krut, back at the station, spoke with Carter's mother—Leah Evans—who told them that Cole lived at the Northern Pike Apartments and that Carter would "stay" there with Cole. (*Id.*) Detective Maritz noted that Sergeant Krut went back to the Northern Pike Apartments to speak with Mr. Malik, who identified Carter and Cole as two (2) of the residents living in the Apartment. (*Id.*)

The Court's prolonged account of Detective Maritz's affidavit leads to a short and simple analysis: there is no doubt that—considering the totality of the affidavit's facts—the magistrate judge had a substantial basis to conclude that probable cause existed to issue the warrant. *See Gates*, 462 U.S. at 236.

As for Carter and Cole's second argument—that there was not a sufficient nexus between Sergeant Krut's and Detective Maritz's evidence and the Apartment—the answer is similarly straightforward. After all, Officer Frisk witnessed Cole pay the rent for the Apartment in cash. Sergeant Krut and Detective Maritz watched Cole leave Building E and get into the Dodge Charger, with what they would later find was ten (10) bricks of heroin in his boxer briefs. And after Carter and Cole's arrest, Ms. Evans identified Cole as a resident of the Northern Pike Apartments and Carter as a frequent guest. Then Mr. Malik similarly identified Carter and Cole as two (2) of the people living in the Apartment. These facts provide a more than sufficient nexus between Cole and Carter and the Apartment, and between the Apartment and drug activity. Thus, the Warrant Clause's "nexus" requirement is easily met in this case.

For the above reasons, Defendants' Motion to Suppress the evidence recovered from the Apartment—including the fentanyl, handguns, and ammunition—is denied.

## IV. CONCLUSION

The Court concludes that the Government demonstrated by a preponderance of the evidence that (1) the traffic stop of Defendants' vehicle was supported by reasonable suspicion; (2) the pat down of Cole was a valid under *Terry* and did not exceed its permissible scope; (3) Cole was not in *Miranda* custody when he made incriminating statements, that Sergeant Krut had already uncovered the contraband at the time Cole made the statements, and that in any event suppression of the physical evidence would be inappropriate; and (4) that the warrant to search the Apartment was supported by probable cause and a sufficient nexus to the Defendants' alleged criminal activity. For the foregoing reasons, Defendant Cole's Motion to Suppress Evidence (ECF No. 71), joined in full by Defendant Carter (ECF Nos. 51, 53), is DENIED.

An appropriate Order will follow.

Mark R. Hornak
Chief United States District Judge

Dated: November 26, 2019

cc:     All counsel of record, Defendants